UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO._____

|  |  |
|---|---|
| JOHN G. DANIELSON, INC.,<br>                          Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| WINCHESTER-CONANT PROPERTIES,<br>INC.<br>                          Defendant | ) |
| | ) |

00 CV 1 1 0 2 1 WGY

Complaint

JURY IS DEMANDED

### Introduction

1. This is an action for damages for copyright infringement in violation of 17 U.S.C. 101 et seq., false designation or description of origin and unfair competition in violation of 15 U.S.C. 1125(a), conversion, and violation of M. G. L. c. 93A for unfair and deceptive acts and practices.

### The Parties

2. The Plaintiff is John G. Danielson, Inc. ("Danielson"). Danielson is, and was at all relevant times, an architectural firm properly practicing architecture in the Commonwealth of Massachusetts. Its principal place of business is in Lexington, Massachusetts.

3. The Defendant is Winchester-Conant Properties, Inc. ("Winchester-Conant"). Upon information and belief, Winchester Conant is a New Hampshire corporation with its principal place of business at 20 Trafalger Square, Nashua, New Hampshire, and is the current owner of property located at 228 Cross Street and 7 Conant Road, Winchester,



Massachusetts (the "Property").  The Property is and was known as "The Willows at Winchester" condominiums.

### Jurisdiction and Venue

4.  This court has jurisdiction over this action based on (a) diversity of citizenship and jurisdictional amount under 28 U.S.C. 1332(a)(1), (b) copyright infringement in violation of 28 U.S.C. 1338(a) and (b), (c) jurisdiction over supplemental claims (28 U. S. C. 1367(a), and (d) principles of pendent and ancillary jurisdiction.

5.  The state common law and statutory claims in this action are so related to substantial federal law claims to which they are joined that they form part of the same case or controversy and arise from the same nucleus of operative facts.

6.  Venue for this action lies in this jurisdiction, because defendant's property is located in Massachusetts, the defendant operates its business in Massachusetts, and the infringing acts were committed in Massachusetts.  (*See* 28 U.S.C. 1391(b)(2) and 1400(a) and (b)).

### General Allegations

7.  On or about June 29, 1987, Louis E. Farese, Trustee of Conant Road Nominee Realty Trust ("Conant Realty Trust"), was the owner of the Property.  He, as Trustee, engaged Danielson to perform architectural services in connection with the development by Conant Realty Trust of the Property into condominiums (the "1987 Project").

8.  The terms of that engagement are set forth in a written agreement, AIA form B141 (1977) as modified (the "1987 Services Agreement").  Basic Compensation for Danielson's services under the Agreement was $532,800, with additional compensation for additional services based primarily on time expended at specified rates.

9. Article 8 of the 1987 Services Agreement, OWNERSHIP AND USE OF

DOCUMENTS, expressly provided:

> 8.1 Drawings and Specifications as instruments of service are and
> shall remain the property of the Architect whether the Project for
> which they are made is executed or not....The Drawings and
> Specifications shall not be used by the Owner on other projects, for
> additions to this Project, *or for completion of this Project by others*
> provided the Architect is not in default under this Agreement,
> *except by agreement in writing and with appropriate compensation*
> *to the Architect.*
>
> 8.2 Submission or distribution to meet official regulatory
> requirements or for other purposes in connection with the Project is
> *not to be construed as publication* in derogation of the Architect's
> rights. (emphasis added)

10. As part of its obligation, Danielson prepared seven preliminary drawings that

were intended to be, and were, submitted to the Town of Winchester (the "Town")

Planning Board and Board of Appeals so that Conant Realty Trust could apply for a site

plan Special Permit ("Site Plan Approval") for the 1987 Project.

11. These initial Danielson drawings, entitled "Willows at Winchester

Condominiums," were dated June 11, 1987. The drawings were identified initially as SP-

1, SP-2, SP-3, A-1, A-2, A-3, and EX-1 and, so labeled, were expressly cited in Conant

Realty Trust's proposed Restrictive Covenant and Agreement that was submitted to the

Town as part of Conant Realty Trust's application for the 1987 Site Plan Approval.

12. These Danielson drawings included the architectural logos of John G.

Danielson, Inc., Architects and Tellelian Associates Architects and Planners

("Tellelian"). Tellelian was a subconsultant to Danielson who since has assigned

all of its rights to Danielson.

13. 1987 Drawing SP-1 was entitled "Building Location Plan." This drawing included all buildings locations, buildings configurations, buildings footprints, parking space layouts, pedestrian walkways, roadways, and free space designs. The drawing was prepared by Danielson, assisted by Tellelian.

14. 1987 Drawing SP-2 was entitled "Roof Plan." It was prepared by Danielson, assisted by Tellelian.

15. 1987 Drawing SP-3 was entitled "Third Floor Plan." It was prepared by Danielson, assisted by Tellelian.

16. 1987 Drawing A-1 was entitled "Schematic Elevation." It described a typical condominium elevation. Drawing A-1 was prepared by Danielson, assisted by Tellelian.

17. 1987 Drawing A-2 was entitled "Schematic Elevation." It described a typical clubhouse elevation. Drawing A-2 was prepared by Danielson, assisted by Tellelian.

18. 1987 Drawing A-3 was a Perspective Drawing. It contained a three dimensional architectural rendering of the "The Willows at Winchester Condominiums." The architectural rendering was drawn by a Mr. Whitman in 1987 for Danielson as a "work made for hire."

19. 1987 Drawing EX-1 was entitled "Existing Conditions Roof Plan." It was prepared by Danielson, assisted by Tellelian.

20. Upon information and belief, in or about June, 1987, Conant Realty Trust, using the foregoing seven Danielson drawings, applied to the Winchester Planning Board and/or Board of Appeals for a Site Plan Approval pursuant to Sections 4.4, 8.52, and 8.7 of the Zoning By-Laws of the Town of Winchester. Danielson's belief is based upon discussions with Farese at the time.

4

21. In its application, Conant Realty Trust sought approval to be permitted to construct four residential buildings containing 70 condominium units and a fifth building intended as a non-residential, community building. A proposed Restrictive Covenant and Agreement signed by Conant Realty Trust on June 9, 1987, accompanied the application.

22. An informal preliminary site-plan review was held before the Board of Appeals on August 18, 1987. A formal hearing before the Board was held on October 20, 1987. On November 4, 1987, the Board of Appeals approved a Special Permit that contained sixteen conditions and expressly incorporated the proposed Restrictive Covenant and Agreement. The Town approved a Building Permit for the Project, as designed by Danielson, on January 27, 1988.

23. On February 1, 1988, the Town's Planning Board executed the Restrictive Covenant and Agreement as a Special Permit and Site Plan Approval. On February 25, 1988, the Special Permit and Site Plan Approval was duly recorded in the Middlesex South Registry of Deeds.

24. The Restrictive Covenant and Agreement provided in Section I:

> ....Any changes to the Project Plans or any additional plans required by [the Board of] Appeals or any other municipal authority in connection with Site Plan Approval or in connection with the grant of (or other action commenced with) such variances or other required municipal approval shall become, ipso facto, a part of the Project Plans.

The "Project Plans" referenced in the Restrictive Covenant and Agreement were the seven initial Danielson drawings identified in paragraphs 11 through 19 above.

25. Section IV, paragraphs B, C, E, F, and J of the Restrictive Covenant and Agreement provided in pertinent part:

B. This Covenant and all restrictions hereby granted shall expire on that day which is thirty years from the date hereof.

C. This Covenant shall be binding for the term set forth in Paragraph B next above, upon the...devisees,...successors and assigns of the undersigned and it is hereby understood and agreed that this Covenant shall run with the Property.

...

E. The Development [Willows at Winchester Condominiums] shall be constructed and thereafter maintained substantially as shown on the Project Plans, copies of which plans have been filed with the Town Engineer and the Planning Board for safekeeping during the term of this Covenant.

F. ...any proposed modification of the Project Plans or of the development as shown on the Project Plans shall first be submitted to the Building Inspector (with copies ...to the Planning Board) for his determination as to the substantiality of such modifications,...

...

J. This Covenant shall not be amended, modified or terminated (or compliance with any provision hereof waived or released) except with the prior written consent of the Grantors, their successors and assigns, and the Town of Winchester, acting by a two-thirds vote of its Town Meeting in accordance with all the requirements for enactment of a zoning change set forth in M.G.L. ch. 40A....

26. During the later part of 1987 and into 1988, Danielson began to prepare more extensive design drawings for "The Willows at Winchester Condominiums" pursuant to the 1987 Services Agreement. These drawings identified the following as Project participants:

A. Developer: Cross Street Realty Nominee Trust, 92 High Street, Suite 22, Medford, MA 02155 (later "Conant Realty Trust").

B. Contractor: The Farese Company, Inc., 92 High Street, Suite 22, Medford, MA 02155.

C. Architects: John G. Danielson, Inc. Architects, 19 Winchester Drive, Lexington, MA 02173 and Tellelian Associates Architects and Planners, 283 Franklin Street, Boston, MA 02110.

D. Consulting Engineers/Civil: Medford Engineering & Survey, 15 Hall Street, Medford, MA 02155.

E. Plumbing-Mech-Elec.: MEA Engineering Associates, 20 Felton Street, Waltham, MA 02154.

F. Geotechnical: Asaf A. Qazilbash & Associates, 120 Beacon Street, Hyde Park, MA 02136.

G. Structural: Wayne A. Weaver & Associates, Inc., 17 Garrison Street, Boston, MA 02110.

H. Landscape Architect: Morgan Wheelock, Inc., 286 Congress Street, Boston, MA 02210.

27. Each of the above entities, other than the Developer and the Contractor, was a subconsultant to Danielson.

28. During the later part of 1987 and into 1988, Danielson produced nearly a full set of drawings based on and derived from the initial seven drawings used to obtain the Site Plan Approval. Subsequently, Danielson made revisions to many of these drawings. The drawings prepared by or on behalf of Danielson are identified in Appendix A to this Complaint and were provided to Conant Realty Trust solely by Danielson in accordance with the 1987 Services Agreement.

29. By mid-1988, Danielson had completed approximately 87% of the services under the 1987 Services Agreement and certain additional services. Conant Realty Trust, however, encountered financial difficulties so severe that it could not pay Danielson for most of its past services and acknowledged this to Danielson.

30. As a result of Conant Realty Trust's financial condition and non-payment, Danielson ultimately ceased to perform services on the Project and has never resumed

such services or completed them to this date. Its outstanding statements have not been paid.

31. As of November 15, 1988, Conant Realty Trust owed Danielson $226,243.04 for architectural services rendered in addition to expenses and interest pursuant to the 1987 Services Agreement. The Project, partially constructed, lay abandoned for several years.

32. At all times relevant to this proceeding, Danielson possessed, and continues to possess, all right, title, and interest in and to the copyright and other rights to all of the drawings identified in paragraphs 13 to 19 above, as well as other drawings created by Danielson for The Willows at Winchester Condominiums (the "Danielson drawings").

33. In or about April, 1994, a representative of Winchester Conant, Inc., d/b/a Starter Homes Realty, LLC ("Starter Homes")[1] approached Danielson. Upon information and belief, Starter Homes was an affiliate of defendant Winchester-Conant,.

34. The Starter Homes representative indicated that it was considering developing the Property, understood that Danielson had done the original design drawings for Conant Realty Trust, and asked Edmond Danielson if Danielson would be interested in creating a new concept for developing the Property. It also inquired and whether Danielson had AUTOCAD capability.

35. Mr. Danielson informed the Starter Homes representative that Danielson could design a new scheme and that AUTOCAD was available through Tellelian.

---

[1] Based on a number of documents, several of which are referenced herein, *infra,* the exact identity and corporate name of the defendant and its various affiliates and their interrelationships is not known clearly to the plaintiff and will be clarified in discovery.

36. In June, 1994, a Starter Homes representative arranged a joint meeting at Tellelian's offices in Boston to discuss Starter Homes' objectives further with Danielson and Tellelian.

37. At this meeting, Starter Homes' representative, Kent L. Brown, asked Mr. Danielson and Daniel Tellelian to design a new condominium concept that involved solely apartments (Danielson's original 1987 design for Conant Realty Trust included townhouses and apartments).

38. Starter Homes' representative stated that it wanted greater simplicity of design and higher density than the apartment condominium units Danielson previously had designed and that had been approved by the Town in 1987-88.

39. Starter Homes' representative also stated that Starter Homes was having another architect design a scheme that contained only townhouses. Starter Homes' representative did not disclose the name of its other architect.

40. Upon information and belief, the "other architect" was Meehan Architects of Nashua, New Hampshire ("Meehan"). Starter Homes also gave Danielson a written schedule for obtaining municipal approval.

41. Danielson and Tellelian prepared a new design for the Property as requested, the plans for which were dated August 12, 1994. These plans contained 80 apartment units. Danielson submitted these plans to Starter Homes on August 12, 1994.

42. Abruptly on August 30, 1994, Kent L. Brown of Starter Homes wrote a letter to Tellelian instructing it and Danielson to cease working on the apartment design or any other design. Starter Homes has had no further contact with Danielson since that time.

43. Upon information and belief, Starter Homes obtained a design from another architect that involved 80 elderly housing units (a project totally different from The Willows at Winchester Condominiums or the 80 unit apartment projects designed by Danielson and previously described) and applied to the Town of Winchester for Site Plan Approval for the 80 elderly housing units design. Danielson had nothing to do with this application.

44. On February 6, 1995, a Special Town Meeting was conducted at which the Town considered whether or not to release the Covenants contained in the 1987-1988 Restrictive Covenant and Agreement on the Property and to authorize the Planning Board to enter into a new Restrictive Covenant and Agreement with Winchester Conant, Inc., a Massachusetts corporation, that had been tendered to the Town and was dated January 19, 1995.

45. Upon information and belief, Starter Homes is an affiliated company of defendant Winchester-Conant, who is listed in the application. The proposed Restrictive Covenant and Agreement proffered by Starter Homes described a 60 condominium units project contained within "no more than seven two-story residential buildings, wood frame with partial red brick front facade." It was accompanied by plans drawn by Meehan. Danielson had no involvement with these plans or this application for a Special Permit.

46. Upon information and belief, a revised proposed Restrictive Covenant and Agreement dated January 30, 1995 was drafted and/or submitted by Starter Homes in which the number of proposed units (60) and two story buildings (7) were unchanged.

47. On March 20, 1995, Wade Welch, Esq., counsel to the Town, answered several legal questions concerning the application by Winchester Properties, Inc. for a

release of the 1987 covenants and approval of a new Restrictive Covenant and Agreement

for the 60 units condominium project.  Some of these issues involved new zoning

regulations that had become effective since the 1987 Site Plan Approval.

48.  Upon information and belief, a redrafted proposed Restrictive Covenant and

Agreement was submitted, in which defendant Winchester-Conant Properties, Inc., a New

Hampshire corporation, was substituted as the applicant.

49.  Upon information and belief, defendant Winchester-Conant's 60

condominium units project failed to obtain approval from the Town.  Defendant

Winchester-Conant tried repeatedly to obtain approval for 60 unit and 70 unit

condominium plans for the Property in the first half of 1995.

50.  The Planning Board Minutes for July 31, 1995, state:

IV.  SITE PLAN REVIEW

Petition No. 3047 - That of [defendant] Winchester Conant Properties, Inc.
(The  Willows) concerning the property at 228 Cross Street and 7 Conant
Road (70 unit proposal).  The Planning Board noted that *any development
on this property must be in accordance with the existing Covenant
endorsed by the Planning Board on February 8, 1988*.  Motion to take no
position on this matter:  Voted 4-0 in favor.

Petition No.. 3048 - That of [defendant] Winchester Conant Properties,
Inc. (The Willows) concerning the property at 228 Cross Street and 7
Conant Road (60 unit proposal).  The Planning Board noted that
authorization for the Planning Board to enter into a new Covenant for
similar proposals *were rejected at the last two sessions* of Town Meeting.
*Any development of this property must be in accordance with the existing
Covenant endorsed by the Planning Board on February 8, 1988*.  Motion
to take no position on this matter.  Voted 4-0 in favor.  (emphasis and
brackets added)

51.  Upon information and belief, defendant Winchester-Conant shortly thereafter

came to the conclusion that it would be difficult or impossible to obtain approval from the

Town to develop the Property except by going back to Danielson's original 70 unit condominium design, because that design had prior Town approval.

52. Upon information and belief, defendant Winchester-Conant determined to do this but did not want to have to pay Danielson for the right to use its drawings. Defendant Winchester-Conant decided instead intentionally to copy Danielson's drawings but to make superficial changes in them in an attempt to disguise that the drawings were copied.

53. Defendant Winchester-Conant had to copy most of the conceptual contents of these drawings, however, in order to ensure Town approval. In effect, Winchester-Conant determined to "piggy back" upon the approval obtained by Conant Realty Trust in 1987-88 by copying critical aspects of the Danielson drawings that underlaid that approval.

54. Upon information and belief, defendant Winchester-Conant acquired a set of Danielson's drawings (that Danielson had created for Conant Realty Trust) from an unknown source, without notifying Danielson, without Danielson's approval, and without paying Danielson. Using a different architect and/or engineer, Winchester-Conant developed a new set of plans that substantially copied Danielson's drawings. This scheme was intentional, fraudulent, and an unfair and deceptive business practice.

55. Upon information and belief, in furtherance of its fraudulent scheme, defendant Winchester-Conant, together with its agents, consultants, or representatives, acting with the knowledge, acquiescence, and approval of defendant Winchester-Conant, proceeded to disguise certain of Danielson's drawings as those of Meehan Architects by substituting, or directing Meehan Architects to substitute, the logo of Meehan Architects

12

for that of Danielson and Tellelian, all of which violated Danielson copyright and constituted a conversion, a fraud, and an unfair and deceptive business practice.

56.  In this fraudulent copying process, Meehan Architects and Winchester-Conant took Danielson drawings, blatantly erased or obliterated Danielson's and Tellelian's logos, and superimposed other architectural logos where Danielson's and Tellelian's logos had pre-existed.

57.  Neither Danielson nor Tellelian was ever contacted by defendant Winchester-Conant or gave its permission for its drawings to be used in this or any fashion.

58.  Danielson's drawings contained subsidiary drawings or supporting information that was developed by Medford Engineering ("Medford"), a subconsultant to Danielson in 1987.  Upon information and belief, Winchester-Conant may have made some business arrangement directly with Medford in the hopes of thereby acquiring some right to the drawings, with intent to defraud Danielson.

59.  The substituted drawings, while not exact duplicates of the Danielson drawings in every respect, copied substantial copyrighted portions of the Danielson drawings that were crucial to obtaining Town Boards approvals under existing circumstances.  Such copying violated Danielson's copyrights.

60.  Upon information and belief, after being refused a Site Plan Approval to proceed with the 60 or 70 condominium units proposals and other proposal(s), in or about June, 1995, defendant Winchester-Conant began activities leading to the submittal of an application to the Winchester Planning Board for Site Plan Approval to develop the property in essentially the same manner that the Town, in 1987-88, had approved for Conant Realty Trust, to wit, as a 70 units condominium development using Danielson's

building configurations, size, number of units per building, and locations, in addition to other similarities.

61. In submitting its proposed plans to the Town for Site Plan Approval, defendant Winchester-Conant used Danielson's drawings after removing Danielson's and Tellelian's logos and, in many cases, substituting those of Meehan Associates. The copying of these drawings was transparent and obvious: all of Danielson's original and revision dates were left on the copied and substituted drawings.

62. In addition, defendant Winchester-Conant converted to its own use, including marketing and advertising of the development, Danielson's architectural rendering for The Willows at Winchester Condominiums, the cover sheet for the drawings referred to above.

63. In issuing its approval of defendant Winchester-Conant's plan as copied from Danielson on December 18, 1995, the Winchester Board of Appeals expressly required that "the proposed improvements shall be constructed in conformity with the following plans (the 'Plans') submitted to the Board and incorporated herein by reference:

Building Location Plan by Medford Engineering...*dated October 5, 1987, revised through July 11, 1995 (C-1);*

Grading Plan by Medford Engineering, *dated October 13, 1987, revised through July 11, 1995 (C-3);*

Utility Plan by Medford Engineering, *dated December 1, 1987, revised through July 11, 1995 (C-4);*

Construction Details by Medford Engineering, *dated October 13, 1987, revised through July 11, 1995 (C-5);*

Profiles by Medford Engineering, *dated October 13, 1987, and revised through July 11, 1995 (two sheets, C-6 and C-7);*

Clubhouse Schematic Elevations drawn by Meehan Architects, dated September 7, 1995 (A-3)

Site Landscape Plan, dated July 13, 1995, revised September 7, 1995 by Meehan Architects (L-1)." (emphasis added)

64. With respect to each of the drawings cited above, and in the approval of the Board of Appeals, a substantially similar drawing was prepared originally by Danielson. Then a derivative drawing was provided to Medford to form the basis of Drawings C-1 through C-7. Finally, upon information and belief, all of these drawings were revised superficially in 1995 by Winchester-Conant or one of its agents, including Meehan Architects or Medford Engineering.

65. The copying and modifying constituted acts of copyright infringement, false designation of origin, conversion, and unfair and deceptive business practices. After such fraudulent copying and modifications were committed, defendant Winchester-Conant submitted the drawings to the Town without notification or compensation to or approval by Danielson.

66. In particular, defendant Winchester-Conant's 1995 application drawing C-1, Building Location Plan (rev. July 11, 1995), referenced by the Town in its 1995 Site Plan Approval, was fraudulently copied from Danielson's 1987 drawing C-1 (rev. Feb. 16, 1988), after the Danielson and Tellelian logos had been removed, and was used successfully and fraudulently by defendant Winchester-Conant to obtain the 1995 Site Plan Approval.

67. Danielson's 1987 drawing C-1 (rev. Feb. 16, 1988) was further and fraudulently revised on August 14, 31, and September 7, 1995, when Meehan Architect's logo was substituted for Danielson's and Tellelian's logos, and the drawing was re-

labeled C-1a. Upon information and belief, all of these changes to Danielson's 1987 drawing C-1 were made knowingly and fraudulently by or at the direction of defendant Winchester-Conant.

68. Winchester-Conant's 1995 application drawing C-2, Existing Site Plan (rev. July 11, 1995), not referenced in the Town's 1995 Site Plan Approval, was fraudulently copied from Danielson's 1987 drawing C-2 (rev. Feb. 16, 1988), Existing Site Plan. The 1995 version of C-2 was made directly from the 1987 version with only a few minor revisions, principally the elimination of existing structures, which presumably had been removed from the Property by this time.

69. Danielson's and Tellelian's logos were removed from Drawing C-2, Medford's logo was left on, and there is no indication of ownership of the Property or the Project on the drawing. Upon information and belief, defendant Winchester-Conant knowingly and fraudulently caused the changes to and misappropriation of Danielson's 1987 drawing C-2, including the removal of the Danielson and Tellelian logos.

70. Defendant Winchester-Conant's 1995 application drawing C-3, Grading Plan (rev. July 11, 1995), was referenced in the Town's 1995 Site Plan Approval and was knowingly and fraudulently copied from Danielson's 1987 drawing C-3, Grading Plan (rev. Feb. 16, 1988). The fraud occurred when Danielson's and Tellelian's logos were removed and minor revisions were made on July 11, 1995, May 14, 1996, and June 5, 1996.

71. Upon information and belief, defendant Winchester-Conant knowingly, intentionally, and fraudulently caused the changes to and misappropriation of Danielson's 1987 drawing C-3, including the removal of the Danielson and Tellelian logos.

72. Winchester-Conant's 1995 application drawing C-4, Utility Plan (rev. July 11, 1995), was referenced in the Town's 1995 Site Plan Approval and was knowingly and fraudulently copied from Danielson's 1987 drawing C-4, Utility Plan (rev. Feb. 16, 1988). Danielson's and Tellelian's logos were removed and minor revisions were made on July 11, 1995.

73. Upon information and belief, defendant Winchester-Conant knowingly, intentionally, and fraudulently caused the changes to and misappropriation of Danielson's 1987 drawing C-4, including the removal of the Danielson and Tellelian logos.

74. Defendant Winchester-Conant's 1995 drawing C-5, Construction Details (rev. July 11, 1995), was referenced in the Town's 1995 Site Plan Approval and was knowingly and fraudulently copied from Danielson's 1987 drawing C-5, (rev. Feb. 16, 1988). Danielson's and Tellelian's logos were removed and minor revisions were made on July 11, 1995.

75. Upon information and belief, defendant Winchester-Conant knowingly, intentionally, and fraudulently caused the changes to and misappropriation of Danielson's 1987 drawing C-5, including the removal of the Danielson and Tellelian logos.

76. Defendant Winchester-Conant's 1995 application drawings C-6 and C-7, Roadway Profiles (rev. July 11, 1995), were referenced in the Town's 1995 Site Plan Approval and were knowingly and fraudulently copied from Danielson's 1987 drawing C-6 and 7, (rev. Feb. 16, 1988). Danielson's and Tellelian's logos were removed and minor revisions were made on July 11, 1995.

77. Upon information and belief, defendant Winchester-Conant knowingly, intentionally, and fraudulently caused the changes to and misappropriation of Danielson's 1987 drawings C-6 and C-7, including the removal of the Danielson and Tellelian logos.

78. Defendant Winchester-Conant's 1995 application drawing L-1, Site Landscape Plan (July 13, 1995), drawn by Meehan Architects and referenced by the Town in its 1995 Site Plan Approval, while not an exact copy of the 1987 Danielson L-1, Planting Plan and Path Layout, was taken and knowingly and fraudulently copied from the Danielson plan with only minor differences.

79. Upon information and belief, Meehan Architects knowingly, intentionally, and fraudulently copied Danielson's L-1 Plan at the direction and for the benefit of defendant Winchester-Conant in order to obtain the 1995 Site Plan Approval by using Danielson's previously approved drawings and with the intent fraudulently to misappropriate Danielson's intellectual and personal property.

80. In or about December 18, 1995, the Winchester Board, as a result of defendant Winchester-Conant's submissions of drawings fraudulently misappropriated and copied from Danielson, gave a Site Plan Approval to defendant Winchester Properties based upon Danielson's copyrighted drawings.

81. Subsequently, defendant Winchester Properties obtained a Building Permit and commenced to construct the Project. As it was doing so, defendant Winchester Properties knowingly, intentionally, and fraudulently converted and used for advertising purposes a sign on which is depicted a graphic image of the Project that was copied directly and without approval from Danielson's 1987 architectural rendering.

18

82. The plans used by defendant Winchester Properties to obtain Site Plan Approval were copies of Danielson's drawings in these material respects, *inter alia:*

a. The location of the buildings' footprints are virtually identical to Danielson's drawing;

b. The configurations of the buildings' footprints are identical to Danielson's drawing;

c. The configurations and layouts of the buildings are taken from Danielson's drawing; and

d. The locations and configurations of all roadways, walkways, and parking areas are identical to those shown on Danielson's drawing.

83. In September, 1999, Danielson applied to the Register of Copyrights for a Certificate of Registration for all of the Danielson drawings, and properly filed an application deposit and fee with the U. S. Copyright Office. On October 18, 1999, a copyright was granted by the U. S. Copyright Office, evidenced by Certificate VAU 457-022.

## COUNT I – Violation of Copyright

84. The plaintiff realleges each of the previous allegations.

85. Plaintiff holds a valid copyright in the Danielson drawings.

86. Defendant had access to the Danielson drawings and opportunity to copy them.

87. The drawings used by Defendant as described herein are substantially similar to the Danielson drawings.

88. Defendant copied or caused to be copied Plaintiff's architectural drawings without authorization or license and thereby infringed Plaintiff's copyright.

89. Defendant's conduct in infringing Plaintiff's copyrights was knowing and willful.

90. Defendant's conduct is actionable under 17 U.S.C. 101, et seq.

91. By infringing Plaintiff's copyright, Plaintiff earned as profit a substantial sum of money well in excess of $50,000.

92. As a result of Defendant's conduct, Plaintiff was substantially damaged and is entitled to recover the greater of the value of its losses or the Defendant's profits.

## COUNT II – CONVERSION

93. The plaintiff realleges each of the previous allegations.

94. Defendant used Danielson's drawings for Defendant's pecuniary purposes.

95. Defendant used Danielson's drawings knowingly, intentionally, and fraudulently.

96. Defendant asserted ownership and control over Danielson's drawings that was inconsistent with Danielson's ownership rights.

97. Danielson did not authorize Defendant or any other person to use its drawings.

98. Danielson was entitled to exclusive possession and use of its property.

99. Defendant's unauthorized use constituted a conversion of Danielson's property and caused Danielson substantial damages.

100. Danielson is entitled to recover the damages caused by the conversion.

## COUNT III – False Designation or Description
## of Origin, and Unfair Competition

101. Danielson realleges each of the previous allegations.

102. The actions of the Defendant, as alleged, constitute a violation of 15 U.S.C. sec. 1125(a), under which Danielson makes claim.

103. Danielson is entitled to the greater of the value of the drawings or the profits earned by Defendant as a result of this violation.

## COUNT IV - Violation of M.G.L. c. 93A

104. The Plaintiff realleges the previous allegations.

105. At all relevant times, Defendant was a "person" engaged in trade or commerce in Massachusetts within the meaning of M.G.L. c. 93A, s. 1, 11.

106. Defendant's actions as alleged herein constitute unfair and deceptive acts and practices in violation of M.G.L. c. 93A, s. 2, 11.

107. Defendant's violations were knowing and willful.

108. As a result of Defendant's unfair and deceptive acts and practices, Defendant has realized great economic benefit and Plaintiff has suffered great economic loss and damage.

109. Plaintiff claims damages equal to the greater of the value of its losses or the profits earned by the Defendant, times three, plus attorneys fees.

21

WHEREFORE, Plaintiff prays this court find that:

A.  Defendant owned a copyright in some or all of the drawings listed in Appendix A.

B.  Defendant knowingly, fraudulently, and intentionally infringed and violated the Plaintiff's copyright (17 U. S. C. 101, et seq.) and other rights (15 U.S.C. 1125(a));

C.  Defendant knowingly, intentionally, fraudulently, and unlawfully converted the Plaintiff's property to its own use, without authority or permission;

D.  Defendant, knowingly, intentionally, fraudulently, unlawfully, and falsely designated the origins of Plaintiff's property and committed unfair competition, without authority or permission;

E.  Defendant shall be permanently enjoined from committing further copyright infringement, conversion, or false designation of the Plaintiff's drawings until it pays the Plaintiff the greater of the value of Plaintiff's losses or the profits Defendant has earned and will earn as a result of its infringement of Plaintiff's copyrights;

F.  Defendant and each of its affiliates, agents, owners, officers, directors, employees, and contracting parties be ordered to return to Plaintiff all of the drawings made by or at the Defendant's direction or as "work for hire" that infringe and violate the copyrights of the Plaintiff;

G.  Defendant and each of its affiliates, agents, owners, officers, directors, employees, and contracting parties be ordered to account for all gains, profits, and advantages, derived or anticipated, from the unauthorized use of the Plaintiff's copyrighted drawings and for other violations of the law;

H. Defendant be ordered to file with the court and serve upon Plaintiff's counsel a report, under oath, setting forth the manner and form in which Defendant has complied with this injunction;

I. Plaintiff is entitled to judgment against the Defendant for the greater of Plaintiff's actual damages or the profits earned or to be earned by the Defendant or its agents, employees, officers, owners, or directors, attributable to the infringement or unauthorized use of Plaintiff's drawings;

J. Plaintiff is entitled to judgment against the Defendant for statutory damages, plus interest and costs, based on Defendant's acts of infringement under 17 U.S.C. and a finding that the infringement was committed willfully;

K. Defendants knowingly and willfully committed unfair and deceptive acts and practices in violation of M.G.L. c. 93A, sec. 1 et seq., as a result of which Defendant is required to pay, and judgment shall be entered against, Defendant in a sum three times the amount of all damages to which the Plaintiff otherwise is entitled, plus attorneys fees and costs; and

L. Such other and further damages as the court deems just and proper.

JOHN G. DANIELSON, INC.,
ARCHITECTS,
By its attorneys,

Anthony E. Battelle, Esq.
BBO # 033402
Construction Law Services
PO Box 15719 Kenmore Station
Boston, MA 02215
Tel. 617-734-0900; Fax 617-738-0218
email: aebattelle@construct-law.com

_Charles R. Heuer_

Charles R. Heuer, Esq., FAIA
BBO # 546717
The Heuer Law Group, Inc.
124 Mt. Auburn Street, Ste. 200N
Cambridge, MA 02138
Tel. 617-628-5290; fax 617-628-8192
email: Heuerlaw@aol.com

May 23, 2000

JURY IS DEMANDED

CLS\Danielson\Compl\05-23-00

## Complaint -- Appendix A

The following drawings were produced by or on behalf of Danielson in 1987 and into February, 1988:

    A.           Cover Sheet, containing the Whitman rendering (formerly Plan A-3)

    B.           C-1, entitled "Building Location Plan" (formerly Plans SP-1, SP-2, and SP-3)

    C.           C-2, entitled "Existing Site Plan" and showing existing foundations of buildings to be removed.

    D.           C-3, entitled "Proposed Grading Plan"

    E.           C-4, entiled "Utility Plan"

    F.           C-5, containing various drain and utility detail drawings

    G.           C-6, containing Roadway A, B, and G elevation details

    H.           C-7, containing Roadway C, D, E, and F elevation details

    I.           L-1, entitled "Planting Plan and Path Layout"

    J.           L-2, entitled "Planting Plan and Details"

    K.           A-1, entitled "Site Plan," formerly Plans SP-1, SP-2, and SP-3

    L.           A-2, entitled "Bldgs. 1, 2, 3, 4 and Clubhouse Key Plan"

    M.           A-3, entitled "Cellar Plan Buildings 1, 2"

    N.           A-4, entitled "Cellar Plan Buildings 3 Building 4 (opp. hand)"

    O.           A-5, entitled "Bldg. 1 & Bldg. 2 Roof Plan"

    P.           A-6, entitled "Bldg. 3  Bldg. 4 (opp. hand)"

    Q.           A-7, entitled "Building 1 & 2 Partial First Floor Plan"

    R.           A-8, entitled "Building 1 & 2 Partial Second Floor Plan"

    S.           A-9, entitled "Building 1 Partial First Floor Plan & Second Floor Plan"

    T.           A-10, entitled "Building 1 & 2 Third Floor Plan"

    U.           A-11, entitled "Building 3, North Partial First Floor Plan, Bldg. 4, Opposite Hand"

    V.           A-12, entitled "Building 3 South Partial First Floor Plan Bldg 4, Opposite Hand"

    W.           A-13, entitled "Building 3 North Partial Second Floor Plan Building 4 Opposite Hand"

    X.           A-14, entitled "Building 3 South Partial Second Floor Plan Bldg 4, Opposite Hand"

    Y.           A-15, entitled "Building 3, North Partial Third Floor Plan Bldg 4 Opposite Hand"

    Z.           A-16, entitled "Building 3, South Partial Third Floor Plan Bldg 4, Opposite Hand"

    AA.         A-17, entitled "Bldg 1 & 2 Garage Plans Bldg 3 Bldg 4 (opp. hand) Partial Garage Plans"

    BB.         A-18, entitled "Building 1 Elevations"

    CC.         A-19, entitled "Building 2 Elevations"

DD.          A-20, entitled "Building 3 Building 4 (opp. hand) Elevations)"

EE.          A-21, entitled "Garage Elevations"

FF.          A-22, entitled "Sections Buildings 1, 2, 3, 4"

GG.          A-23, entitled "Sections Buildings 1, 2, 3, 4"

HH.          A-24, entitled "Wall Sections"

II.          A-25, entitled "Wall Types & Plan Details"

JJ.          A-26, entitled "Sections Stairs A, B, C, D Elevator"

KK.          A-27, entitled "Building One Interior Lobby Plans & Elevations"

LL.          A-28, entitled "Bldg 1 & Bldg 3 Interior Lobby Plans & Elevations"

MM.          A-29, entitled "Clubhouse Existing Conditions"

NN.          A-30, entitled "Clubhouse Floor Plans"

OO.          A-31, entitled "Clubhouse Elevations & Section"

PP.          SP-1, entitled "Foundation & Basement Plan First Floor Framing & Garage Fdn. Plan"

QQ.          SP-2, entitled "Second Floor Framing & Garage Roof Framing, Third Floor Framing & Low Roof Framing"

RR.          SP-3, entitled "Roof Framing Plan Building 1 Third Floor Framing Plan Building 1"

SS.          SP-4, entitled "Foundation & Basement Plan Bldg 2 First Floor Framing & Garage Fdn. Plan Bldg 2"

TT.          SP-5, entitled "Second Floor Framing Plan & Garage Roof Framing Plan, Third Floor Framing Plan"

UU.          SP-6, entitled "Roof Framing Plan Building 2"

VV.          SP-7, entitled "Foundation & Basement Plan Building 3"

WW.          SP-8, entitled "First Floor Framing & Garage Fdn. Plan

XX.          SP-9, entitled "Second Floor Framing & Garage Roof Framing Plan"

YY.          SP-10, entitled "Roof Framing Plan Building 3"

ZZ.          P-1, entitled "Plumbing Site Plan"

AAA.          P-2, entitled "Plumbing Cellar Plan - Building 1 Cellar Plan - Building 2"

BBB.          P-3, entitled "Building 1 First Floor Plumbing"

CCC.          P-4, entitled "Building 1 Second Floor Plan Plumbing"

DDD.          P-5, entitled "Building 1 Third Floor Plan Plumbing"

EEE.          P-6, entitled "Building 2 First Floor Plan Plumbing"

FFF.          P-7, entitled "Building 2 Second Floor Plan Plumbing"

GGG.          P-8, entitled "Building 2 Third Floor Plan Plumbing"

HHH.          P-9, entitled "Plumbing Cellar Plan Building 3"

III.          P-9A, entitled "Plumbing Cellar Plan Building 4 (opp. hand)"

JJJ.          P-10, entitled "Plumbing Building 3 Building 4 (opp. hand) First Floor Plan"

KKK.          P-11, entitled "Plumbing Building 3 Building 4 (opp. hand) Second Floor Plan"

LLL.     P-12, entitled "Plumbing Building 3 Building 4 (opp. hand) Third Floor Plan"

MMM.     P-13, entitled "Plumbing W&V Risers"

NNN.     P-14, entitled "Plumbing W&V Water Risers"

OOO.     FP-1, entitled "Fire Protection Site Plan"

PPP.     FP-2, entitled "Fire Protection Cellar Plan Building 1 Cellar Plan Building 2"

QQQ.     FP-3, entitled "Fire Protection Cellar Plan Building 3 Building 4 (Opp. Hand)"

RRR.     DR-1, entitled "Drainage Site Plan"

SSS.     M-1, entitled "Mechanical Site Plan"

TTT.     M-2, entitled "Building 1 Building 2 Cellar Plan Mechanical"

UUU.     M-3, entitled "Building 1 First Floor Plan Mechanical"

VVV.     M-4, entitled "Building 1 Second Floor Plan Mechanical"

WWW.     M-5, entitled "Building 1 Third Floor Plan Mechanical"

XXX.     M-6, entitled "Building 2 First Floor Plan Mechanical"

YYY.     M-7, entitled "Building 2 Second Floor Plan Mechanical"

ZZZ.     M-8, entitled "Building 2 Third Floor Plan Mechanical"

AAAA.     M-9, entitled "Building 3 Building 4 (opp. hand) Cellar Plan Mechanical"

BBBB.     M-10, entitled "Building 3 Building 4 (opp. hand) First Floor Plan"

CCCC.     M-11, entitled "Buiilding 3 Building 4 (opp. hand) Second Floor Plan"

DDDD.     M-12, entitled "Building 3 Building 4 (opp. hand) Third Floor Plan"

EEEE.     M-13, entitled "Mechanical Schedules & Details"

FFFF.     E-1, entitled "Electrical General Notes Legend Details"

GGGG.     E-2, entitled "Electrical Site Plan"

HHHH.     E-3, entitled "Electrical Cellar Plan Building 1 Cellar Plan Building 2"

IIII.     E-4, entitled "Building 1 First Floor Plan Electrical"

JJJJ.     E-5, entitled "Building 1 Second Floor Plan Electrical"

KKKK.     E-6, entitled "Building 1 Third Floor Plan Electrical"

LLLL.     E-7, entitled "Building 2 First Floor Plan Electrical"

MMMM.     E-8, entitled "Building 2 Second Floor Plan Electrical"

NNNN.     E-9, entitled "Building 2 Third Floor Plan Electrical"

OOOO.     E-10, entitled "Electrical Cellar Plan Building 3 Building 4 (opp. hand)"

PPPP.     E-11, entitled "Building 3 Building 4 (opp. hand) First Floor Plan"

QQQQ.     E-12, entitled "Building 3 Building 4 (opp. hand) Second Floor PLan"

RRRR.     E-13, entitled "Building 3 Building 4 (opp. hand) Third Floor Plan"